Joseph H. GARRETT, Ramona B. Holden, and Marie Singletary, Plaintiffs,

v.

R. J. REYNOLDS INDUSTRIES, INC., Defendant.

Ramona B. HOLDEN and Marie Singletary, Plaintiffs,

v.

R. J. REYNOLDS INDUSTRIES, INC., Defendant.

Civ. A. Nos. C–75–539–WS, C–76–176–WS.

United States District Court, M. D. North Carolina, Winston-Salem Division.

Dec. 27, 1978.

J. LeVonne Chambers of Chambers, Stein, Ferguson & Becton, Charlotte, N. C., for plaintiffs.

Charles Vance, W. Andrew Copenhaver and David A. Irvin of Womble, Carlyle, Sandridge & Rice, Winston-Salem, N. C., for defendant.

## MEMORANDUM OPINION

HIRAM H. WARD, District Judge.

Class action lawsuits are often complex and laborious, and the history of these two related actions is no exception. On December 15, 1975, Joseph H. Garrett, Ramona B. Holden and Marie Singletary commenced *Garrett, et al. v. Industries*, C–75–539–WS, alleging that on the basis of race and sex, they had been discriminated against by defendant, R. J. Reynolds Industries (Industries), in its employment practices, in violation of 42 U.S.C. § 2000e, *et seq.* (Title VII) and 42 U.S.C. § 1981. They sought to represent all blacks, who, since July 2, 1965,

had been, were presently, or would be in the future discriminated against on the basis of race and sex by the defendant.

Garrett, a black male, was employed by Industries in Winston-Salem, North Carolina, from April, 1973, until December, 1973. Holden, a black female, alleged that she had been employed by Industries in Winston-Salem from February, 1975, until July, 1975. Holden was initially hired as a temporary employee of Industries on January 8, 1975. She became a regular employee of Industries' subsidiary R. J. Reynolds Tobacco Co. (Tobacco) from February 3, 1975, until her discharge in July, 1975. Marie Singletary, a black female, was employed by Industries in Winston-Salem from October, 1973 until June, 1975.

On January 7, 1976, Industries moved to dismiss a part of the action inasmuch as the complaint failed to allege facts supporting this Court's jurisdiction under 42 U.S.C. § 2000e–5(f)(1). Holden and Singletary failed to allege they had exhausted their administrative remedies and Garrett stated he had received his right-to-sue letter more than 90 days prior to the filing of the complaint.[1]

On January 27, 1976, the plaintiffs moved to amend their complaint to show that plaintiffs Holden and Singletary had now been advised of their right to sue. On April 13, 1976, plaintiffs Holden and Singletary filed a separate action (entitled *Holden, et al. v. R. J. Reynolds Industries*, C–76–176–WS) against Industries alleging the same class action sex and race discrimination at issue in *Garrett*. Therefore, the Court denied plaintiffs' motion to amend their complaint in *Garrett* and dismissed the 42 U.S.C. § 2000e claims, directing the *Garrett* action to proceed only on the 42 U.S.C. § 1981 claim.

*Garrett v. Industries*

Although the two suits followed a similar pattern moving through discovery, for ease of understanding each will be discussed separately. The plaintiffs in *Garrett* moved for class certification on May 10, 1976, although they actually sought postponement of class certification until "all" discovery was completed. Plaintiffs also moved to further amend their complaint to add Holden's permanent employer, Tobacco, as an additional defendant. Industries opposed the motion and moved to dismiss the action as to the plaintiff Holden or in the alternative to grant summary judgment on the claims of Holden because she was not employed by Industries during the relevant time period covered by the allegations of the complaint. The latter motion was supported by an uncontested affidavit.

Magistrate Smith conducted an initial pre-trial conference on June 16, 1976. He recommended that plaintiffs be allowed to amend their complaint to add Tobacco, alleging a violation of Section 1981 only, and that plaintiffs' motion to compel answers to interrogatories be granted with limited exceptions. The Magistrate further recommended deferring a decision on Industries' motion to dismiss Holden's claims until the completion of discovery. The defendant, Industries, appealed to this Court from the Magistrate's ruling that it fully answer certain interrogatories and his recommendation to allow the plaintiffs to add Tobacco as a party. Counsel for all parties subsequently conferred in an attempt to resolve their discovery conflicts.

On November 23, 1976, a hearing was held on plaintiff's motion for class certification. At that hearing, plaintiffs filed eight documents.[2] However, the contents of the official file failed to reflect the results of all discovery which had taken place. The Court ordered the parties to meet in an

---

1. Garrett was notified on September 12, 1975, of his right to bring an action in the United States District Court within 90 days. This action was filed on December 15, 1975.

2. The documents consisted of a supplemental memorandum in response to defendant's opposition to class certification, Interrogatories to

Tobacco, Request for Production from Industries, Second Interrogatories to Industries, Motion to Compel Tobacco to Answer Interrogatories, Motion to Compel Industries to Produce, and an Affidavit of plaintiffs' counsel in support of class certification.

effort to agree to a protective order and to submit all discovery material to the Court for *in-camera* review. In addition, the Court required that the parties meet and stipulate what issues remained outstanding.[3] The stipulation was filed on December 5, 1976.

On March 7, 1977, the plaintiffs moved to depose Marshall Bass, Corporate Director, Personnel Development, for R. J. Reynolds Industries. By order dated August 12, 1977, the Court allowed plaintiffs to depose Bass as to the existence of any joint operation or control between Tobacco and Industries concerning personnel practices and employment opportunities. The Court provided both sides the opportunity to file additional briefs on the issue of class certification and on the issue of whether Tobacco should be added as a party defendant.

Subsequently on December 1, 1977, Clara Pinkney and Robert Burt, former employees of Industries, filed a motion to intervene in this action.

Thus in *Garrett v. Industries*, C–75–539–WS, the following items require the attention of this Court:

(1) Plaintiffs' Motion for Class Certification.

(2) Plaintiffs' Motion to Add Tobacco as a Party Defendant.

(3) Defendant's Motion to Dismiss Holden's claims.

(4) Plaintiffs' and Defendant's various discovery motions.

(5) Pinkney's and Burt's Motion to Intervene.

*Motion for Class Certification—Garrett v. Industries*

While the plaintiffs originally sought to represent a much broader class, the plaintiffs now seek to have certified a class defined as follows:

[A]ll black applicants for employment at and employees of R. J. Reynolds Industries Inc. in Forsyth County, North Carolina, who have been denied employment or limited in or denied employment opportunities because of their race or color at anytime since [Dec. 15, 1972].[4]

Rule 23(a), Federal Rules of Civil Procedure, entitled *Prerequisites to a Class Action*, provides that "[o]ne or more members of a class may sue . . . as representative parties on behalf of all only if

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class."

In addition to the requisites of Rule 23(a), before an action can be maintained as a class action, one of the several alternative requirements of Rule 23(b) must be met. As in most race and sex discrimination actions, the plaintiffs attempt to satisfy Rule 23(b)(2):

[T]he party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.[5]

Rule 23(c), Federal Rules of Civil Procedure provides:

(1) As soon as practicable after the commencement of an action brought as a class action, the court shall determine by

---

**3.** A great deal of informal discovery had taken place to which the Court was without benefit. It was hoped that by requiring a meeting the remaining discovery matters could be resolved without resorting to the Court.

**4.** Plaintiffs conceded that in *Garrett* their class could go back no earlier than three years prior to the filing of the complaint. This is because *Garrett* is solely a 42 U.S.C. § 1981 action. *See*

Plaintiff's Brief (filed November 29, 1977), n. 17 and accompanying text at p. 11.

**5.** While the thrust of Rule 23(b)(2) concerns the applicability of injunctive or declaratory relief, it has been interpreted to allow class members recovery of back pay as one element of equitable relief. *Robinson v. Lorillard Corp.*, 444 F.2d 791 (4th Cir. 1971).

order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.

To that end, Local Rule 17(b)(3) requires that "[w]ithin 90 days after the filing of a complaint in a class action, unless this period is extended on motion for good cause appearing, the plaintiff shall move for a determination under subdivision (c)(1) of Rule 23, F.R.Civ.P., as to whether the case is to be maintained as a class action."

■ In making a Rule 23(c)(1) pre-trial determination, the Court is aware that suits of this nature may be appropriate for class certification. Nevertheless:

Discrimination cases do not qualify as *per se* class actions; they must meet the requirements . . . for class certification the same as any other type of action and may not be treated as true class actions merely because they are supported by "boiler plate memoranda laden with self-serving conclusions." Any notion that such cases do not require the same inquiry with reference to compliance with 23 as other types of cases was authoritatively dispelled by the decision in *East Texas Motor Freight v. Rodriguez, supra* 431 U.S. [395] at 405, 97 S.Ct. [1891] at 1898, [52 L.Ed.2d 453] in which the Court said that, while "suits alleging racial or ethnic discrimination are often by their very nature class suits, * * * careful attention to the requirements of Fed.Rul.Civ.Proc. 23 remains nonetheless indispensable" in such cases. And that has long been the rule in this Circuit. *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1312 (4th Cir. 1978) (footnote omitted).

■ The plaintiffs have the burden of proving the maintainability of this suit as a class action. *Windham v. American Brands, Inc.*, 565 F.2d 59, 64 n. 6 (4th Cir. 1977). The type and scope of review to be employed by this Court is as follows:

. . . on the basis of the discovery had, to identify the character or type . . . of each plaintiff's claim and then to determine whether there was a

class to which such claim of the plaintiff was common and of which it was typical, sufficiently numerous to justify class certification.

*Doctor v. Seaboard Coast Line R. R.*, 540 F.2d 699, 708–09 (4th Cir. 1976).

Neither plaintiffs or this Court may rely on the unsupported allegations in the complaint. The Fourth Circuit Court of Appeals noted in *Doctor* that:

[i]n determining whether the plaintiff has met his or her burden, . . . '[t]he [trial court's] determination usually should be predicated on more information than the complaint itself affords.' . . . The court may, and often does, permit discovery relating to the issues involved in maintainability, and a preliminary evidentiary hearing may be appropriate or essential as a part of the vital management role which the trial judge must exercise in class actions to assure that they are both meaningful and manageable.

540 F.2d at 707.

Recently, in *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1312–13 (4th Cir. 1978), the court was more explicit:

In resolving the issue of class certification, the court *may not* confine itself to the allegations of the complaint. An intelligent decision on class certification *requires* "at least a preliminary exploration of the merits" of the plaintiff's claim. Based on that exploration, the court must make specific findings establishing that the case satisfies the several requirements for certification.

(emphasis added; footnote omitted).

■ Plaintiffs often identify their class action claims by showing either one of two broad types of discrimination. These are disparate impact and disparate treatment. *See Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 n. 15 (1977). In disparate impact cases the plaintiff must show some facially neutral barrier which has the effect of holding back minorities. A facially neutral barrier has the effect of excluding minorities from employ-

ment opportunities at a higher rate than others, without a sufficient business necessity supporting the result. The classic example of a disparate impact case was the requirement of a high school diploma in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

Disparate treatment is slightly different. In a disparate treatment case the plaintiff cannot find a facially neutral barrier which prevents minorities from being properly represented, but can show nonetheless that minorities are not properly represented within the company's personnel structure. By "properly represented" it is meant that the percentage of minorities in the particular jobs of the company are not roughly equivalent to the percentage of available minorities in the relevant population. It is this type of discrimination that plaintiffs allege here. If plaintiffs can show that significantly less minorities are found in the various job categories than one would expect to find based on the relevant population, then an inference of discrimination would exist.

Plaintiffs here have aimed initial discovery toward establishing the existence of across-the-board discrimination by the defendant. Across-the-board charges are a device whereby a person alleges that he has been injured by some discriminatory policy or practice of the defendant and attempts to represent others in different job categories who he believes were also injured by the same or similar policy and practice. *Barnett v. W. T. Grant*, 518 F.2d 543 (4th Cir. 1975); *Johnson v. Georgia Highway Express, Inc.*, 417 F.2d 1122 (5th Cir. 1969).

The Court must exercise particular care in reviewing a broad attack on the entire employment structure of a defendant by a few plaintiffs. In seeking to pursue class action representation in such a situation, plaintiffs bear the burden of showing they meet each of the requirements of Rule 23, Federal Rules of Civil Procedure. *Roman v. ESB, Inc.*, 550 F.2d 1343 (4th Cir. 1976). The Fourth Circuit recently noted:

. . . it has been stated [that *Roman v. ESB, Inc.*] "accords . . . with the recent Supreme Court Decision in *East Texas Motor Freight System, Inc. v. Rodriguez*, which may sound the death knell for 'across-the-board' suits in discrimination cases. The *Rodriguez* Court held that to qualify as a class representative in discrimination cases, a plaintiff must be a member of the class he attempts to represent and 'possess the same interest and suffer the same injury' as other class members. Noting that the mere fact a complaint alleges discriminatory practices does not insure the named plaintiffs will adequately protect class interests, the Court stated that Rule 23 must be carefully applied in discrimination cases, and held that because the named plaintiffs had not personally suffered injuries as a result of the practices they sought to challenge, they were ineligible to represent a class of persons who did suffer injuries as a result of those practices." *Fourth Circuit Review*, 35 *Wash. & Lee L.Rev.* 433, 528–529 (1978). *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1313 n. 53 (4th Cir. 1978).

In *East Texas Motor Freight v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), the evidence showed that the plaintiffs were hired as city drivers and that the company had a history of not employing minorities as over-the-road drivers. (505 F.2d at 48) Nevertheless, since plaintiffs stipulated that they were not discriminated against in their initial hiring and since they were not then qualified to be over-the-road drivers, they could not be class representatives for minorities who were harmed by the company's policy of not hiring minorities as over-the-road drivers.[6] In the present case, the named plaintiffs must be members of the purported class they seek to represent. Therefore, the Court must be particularly cognizant of what interests and what injuries the plaintiffs have as compared with the interests and injuries of the

---

**6.** The government's bringing a pattern and practice suit under 42 U.S.C. § 2000e–6 apparently does not face this limitation. *Teamsters v. United States, supra.*

proposed class. *See Belcher v. Bassett Furniture Industries, Inc.*, 588 F.2d 904, 906 n. 3 (4th Cir. 1978).

Because of the interests involved in this case, plaintiffs' attempt to mount an across-the-board attack is clearly overbroad. There is absolutely no evidence, nor do plaintiffs even contend, that they are now or ever were qualified to fill an official's and manager's, technician, craftsman, or operative job category position. Plaintiffs have a narrow and confined interest in defendants' employment practices as to the professional and clerical positions.

Plaintiff Garrett was hired as a Systems Analyst by an Industries' subsidiary on July 18, 1972. In June, 1973, he was transferred to Industries. He was terminated in December, 1973, for poor work performance. At the time of plaintiff's employment, four of the 38 persons (10.5%) performing such work were black. Of the 11 employees having the title "Systems Analyst," four received less pay than plaintiff, one equal to him, and five were paid more. Plaintiff's job was classified as being in the professional category. During 1973 and through 1976 Industries discharged or involuntarily separated 15 persons, 6 of whom were black.

Plaintiff Singletary applied for an office/clerical position on June 19, 1973. She was employed as a temporary clerk on October 8, 1973. She was terminated June 13, 1975, for the reason that no work was available. From October 8, 1973, to June 30, 1975, 122 persons were hired as temporary clerks; 36 (29.5%) were black; 116 (95.1%) were female. Also during that period 56 persons were made permanent clerks, 10 of whom were black (17.9%) and 48 female (85.7%). All temporary employees received the same wages and the position does not offer promotions or fringe benefits. During 1973 and through 1976, 110 temporary payroll employees were terminated, 29 of whom were black (26.4%).

Plaintiff Holden claims she was employed as a clerk by Industries from February, 1975, until July of that year. The facts show this plaintiff was in fact employed and terminated by Tobacco.

The movants for intervention merely allege they are former employees of Industries and they left employment or were discharged. In a proposed complaint, Intervenor Pinkney states she was employed by defendant as a professional employee in 1971 and later forced to resign. Intervenor Burt worked as some type of employee from June, 1976, to October 11, 1977. They charge racial discrimination.

■ Plaintiffs' various briefs never come to grips with the prerequisites of Rule 23. Rather, they seek to attain class certification based mainly on their *allegations* of discrimination. Considering this deficit alone, the Court could well deny the motion.[7] Plaintiffs never once attempt to integrate each of their claims with that of the purported class. Instead, they merely attempt to bring into litigation all departments of defendant. With regard to the numerosity requirement of Rule 23, plaintiffs merely state that the known black applicants for employment number 400 and female applicants number 1000. However, all plaintiffs and movants for intervention were in fact *employed* by defendant. Successful applicants, *i. e.*, employees, cannot represent a class of unsuccessful applicants because of their different interests and injuries. *See Miller v. Motorola, Inc.*, 76 F.R.D. 516 (N.D.Ill.1977); *Lightfoot v. Gallo Sales Co.*, 15 FEP Cases 615, 619–20 (N.D.Cal.1977). The only common thread which even these named plaintiffs all share is that they were terminated. With plaintiffs' interests confined to professional and clerical positions, the plaintiffs have failed to meet the numerosity requirement of Rule 23(a)(1), Fed.R.Civ.P., as the figures recited above indicate. *See Kelley v. Norfolk & Western Railway Co.*, 584 F.2d 34 (4th Cir. 1978).

---

7. The Court again stresses that allegations of across-the-board discrimination are insufficient to certify a broad class. *See Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1312 (4th Cir. 1978). *See* *also Belcher v. Bassett Furniture Industries, Inc.*, 588 F.2d 904, 906 (4th Cir. 1978) (court should go beyond "boiler-plate" allegations).

Although the Court believes that applying the rationale and implications of *Rodriguez* and *Shelton* warrants limiting the group which plaintiffs could represent, and that by such limitation the numerosity requirement is not met, the Court will proceed to examine whether the other requisites for class certification have been met.

When a plaintiff seeks class certification by merely making broad allegations of across-the-board discrimination, the Court is hampered in deciding whether a more confined class might be appropriate for certification. At best, the Court can only examine each of defendant's departments to see if there is any indicia, any reasonable inference, of discrimination. In the present case, the Court will also examine those departments with which plaintiffs have no connection, although it believes that such examination is not required. Plaintiffs have not specifically identified other persons who purportedly have claims typical of their own. Plaintiffs rely solely on gross statistical data gathered during discovery.

In establishing the presence of discriminatory or biased treatment the use of statistical evidence is without substitute. In *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) the Supreme Court guardedly commended the use of statistics:

> In any event, our cases make it unmistakably clear that "[s]tatistical analyses have served and will continue to serve an important role" in cases in which the existence of discrimination is a disputed issue. [citations omitted] We have repeatedly approved the use of statistical proof, where it reached proportions comparable to those in this case, to establish

a prima facie case of racial discrimination in jury selection cases, [citations omitted]. Statistics are equally competent in proving employment discrimination. We caution only that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances.

431 U.S. at 339, 97 S.Ct. at 1856, 52 L.Ed.2d at 417.

■ The Court will review the statistical data in the present case to determine whether an inference of discrimination exists. If no reasonable inference of discrimination is revealed by the statistics, the Court would not certify a class for an across-the-board attack. The individual plaintiffs would have failed to show that there exist questions of law or fact common to the proposed class, as required by Rule 23(a)(2), Fed.R.Civ.P., and they would have failed to show that their claims are typical of the claims of the proposed class, as required by Rule 23(a)(3). The only viable claims that would remain before the Court would be the particular ones of the individual plaintiffs. Furthermore, if the statistics do not provide an inference of discrimination, the plaintiffs would fail to satisfy Rule 23(b)(2), because they would not have shown that the defendant had acted on grounds generally applicable to the proposed class.

In the present case both the plaintiffs and the defendant argue strenuously that their positions are supported by the statistical evidence which has been gathered.[8] Regrettably, however, neither side has sought

---

**8.** The plaintiffs attempt to bolster their statistical evidence by further allegations of across-the-board discrimination. The Court can only note that those allegations were not supported by any facts in the record. For example, the plaintiffs allege that Industries was organized as basically a white male staff. No evidence in the file supports that contention. They assert that black employees were, as of 1976, concentrated in certain departments and lower job and pay classifications. As will be shown later in this opinion, the statistical evidence does not support the allegations that blacks were concentrated in certain departments and lower job categories. Concerning lower pay classifications the plaintiffs' attorneys possess the existing pay scale for every employee of the defendant and could by the computer print-out determine the race of each employee. Yet no attempt was made to assemble that data in a meaningful way for the Court's review. In light of the overwhelming evidence supporting the absence of across-the-board discrimination in this case the Court declines to further analyze the raw data submitted with the class certification motion.

to interpret the statistics for the Court in other than the crudest fashion. Thus the unassisted task of analyzing the data has fallen squarely on the shoulders of this Court.[9]

Basically the statistical evidence presented to the Court for in-camera review and in the official file shows the composition of the work force at Reynolds Industries from 1973 through June 30, 1976, and how that work force relates to the National Average for minorities in the high level job categories and to the Greensboro, High Point, and the Winston-Salem Standard Metropolitan average for minorities in the remaining job categories. The file also contains statistical data concerning the number and percentage of minorities who applied for employment, the number and percentage of minorities who were hired in the various job categories, and the number and percentage of minorities who were promoted within the various job categories at Reynolds Industries from 1973 through June 30, 1976.

Analysts have long recognized that just because a random drawing from a known sample does not exactly match the population from which it was extracted, that fact alone does not necessarily mean that the drawing was tainted or biased. This is obvious to anyone with even the slightest knowledge of Statistics or Applied Mathematics. *See Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 n. 20 (1977).

Anyone who has ever flipped a quarter or rolled a die knows that just because the quarter does not land on "heads" every other time it is flipped or just because the die does not land on "1" once out of every six times the die is rolled, it does not necessarily mean that the quarter or die is not "good." However if the quarter never lands on "heads" after a hundred flips or if the die never lands on "1" after three hundred rolls, one would obviously be suspicious.

The same rationale supports the idea that where 10% of a section of a population has a particular characteristic (skin color or national heritage) and where a company employs 100 people from that section of the population, the mere fact that only 9 people with the particular characteristic are employed by the company does not without more mean that the company was biased in its employment practices. However, if the company employed only one or no persons with the particular characteristic, the statement that the company was unbiased in the selection of its employees would certainly be suspect.

The Supreme Court has recognized this very aspect of statistical analysis in two recent opinions. *See Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). In those two cases the Supreme Court utilized basic statistical analysis and compared observed results with expected results assuming an unbiased selection. In both cases the Court recognized the rule, evidently well known to mathematicians for years, that if the difference between an expected and an observed exceeds two or three standard deviations it would not be a valid hypothesis to say that the observed was drawn in an unbiased manner from the population from which the expected was computed. *See Hazelwood School District v. United States, supra* at 311 n. 17, 97 S.Ct. at 2743 n. 17, 53 L.Ed.2d at 779 n. 17; *Castaneda v. Partida, supra* at 496 n. 17, 97 S.Ct. at 1281 n. 17, 51 L.Ed.2d at 512 n. 17. Inversely one could say that when the observed results are within two or three standard deviations of the expected, there would be no reason, absent other factors, to doubt the proposition that the observed was the result of an unbiased selection from the known population.

With this in mind, the Court begins the laborious task of analyzing the mass of data

9. A task, incidentally, that the Court does not propose to perform again. The plaintiff seeking to represent a class has the burden to show the Court that the suit is properly maintainable as a class action. *See* Local Rule 17(b)(5). Such a showing should include a clear, cogent, and orderly presentation of arguments and supporting evidence.

which has been collected.[10] At sometime from January 1, 1973, through June 30, 1976, the following job categories were present in the R. J. Reynolds Industries employment structure:

(1) Officials and Managers

(2) Professionals

(3) Technicians

(4) Office and Clerical

(5) Craftsmen (skilled)

(6) Operatives (semi-skilled)

The following tables show the job classifications and indicate the number and percentage of racial minorities employed in that particular job classification for the years 1973, 1974, 1975 and 1976 (through June 30, 1976).[11] The tables also show the percentage of minorities existing in the work force and the number that would have been employed if that percentage had been met exactly (i. e., the expected) as compiled by use of the National Minority average or the Greensboro, High Point, Winston-Salem Metropolitan average for minorities.

### JOB CATEGORY—Officials and Managers

| Year (a) | Minorities Employed Over Total Employed (b/c) | Percent Minorities Employed (d) | National Percent Minorities (e) | Minorities Expected if National Average Met (f) (f = e x c) |
|---|---|---|---|---|
| 73 | 3/121 | 2.5% | 4.3% | 5.2 |
| 74 | 5/158 | 3.2% | 5.1% | 8.1 |
| 75 | 7/197 | 3.6% | 5.1% | 10.0 |
| 76 | 5/203 | 2.4% | 5.1% | 10.4 |

### Professionals

| Year (a) | Minorities Employed Over Total Employed (b/c) | Percent Minorities Employed (d) | National Percent Minorities (e) | Minorities Expected if National Average Met (f) (f = e x c) |
|---|---|---|---|---|
| 73 | 4/107 | 3.7% | 6.7% | 7.2 |
| 74 | 7/155 | 5.2% | 7.2% | 11.2 |
| 75 | 9/162 | 6.2% | 7.2% | 11.7 |
| 76 | 17/260 | 6.5% | 7.2% | 18.8 |

### Technicians

| Year (a) | Minorities Employed Over Total Employed (b/c) | Percent Minorities Employed (d) | Metropolitan Percent Minorities (e) | Minorities Expected if Metropolitan Average Met (f) (f = e x c) |
|---|---|---|---|---|
| 73 | 1/21 | 4.8% | 9.8% | 2.1 |
| 74 | 4/42 | 9.5% | 9.8% | 4.1 |

10. For those of us who do not possess a substantial background in mathematics, a pocket calculator with a square root function is not only desirable, it is absolutely essential in analyzing such data.

11. Hereafter the date 1976 when used with statistics will mean only through June 30, 1976, unless otherwise indicated.

### Technicians

| Year | Minorities Employed Over Total Employed | Percent Minorities Employed | Metropolitan Percent Minorities | Minorities Expected if Metropolitan Average Met |
|------|------|------|------|------|
| (a) | (b/c) | (d) | (e) | (f) (f = e x c) |
| 75 | 9/62 | 14.5% | 9.2% | 5.7 |
| 76 | 9/71 | 12.7% | 9.2% | 6.5 |

### Office and Clerical

| Year | Minorities Employed Over Total Employed | Percent Minorities Employed | Metropolitan Percent Minorities | Minorities Expected if Metropolitan Average Met |
|------|------|------|------|------|
| (a) | (b/c) | (d) | (e) | (f) (f = e x c) |
| 73 | 54/463 | 11.7% | 10.9% | 50.5 |
| 74 | 100/693 | 14.4% | 10.9% | 75.5 |
| 75 | 108/706 | 15.3% | 10.2% | 72.0 |
| 76 | 97/684 | 14.2% | 10.2% | 70.0 |

### Craftsmen (Skilled)

| Year | Minorities Employed Over Total Employed | Percent Minorities Employed | Metropolitan Percent Minorities | Minorities Expected if Metropolitan Average Met |
|------|------|------|------|------|
| (a) | (b/c) | (d) | (e) | (f) (f = e x c) |
| 73 | 0/0 | — | 10.3% | — |
| 74 | 4/10 | 40% | 10.3% | 1.0 |
| 75 | 6/12 | 50% | 9.1% | 1.1 |
| 76 | 3/7 | 42.9% | 9.1% | .7 |

### Operatives (Semi-Skilled)

| Year | Minorities Employed Over Total Employed | Percent Minorities Employed | Metropolitan Percent Minorities | Minorities Expected if Metropolitan Average Met |
|------|------|------|------|------|
| (a) | (b/c) | (d) | (e) | (f) (f = e x c) |
| 73 | 0/0 | — | 22.4% | — |
| 74 | 2/2 | 100% | 22.4% | .4 |
| 75 | 1/6 | 16.7% | 20.1% | 1.2 |
| 76 | 0/0 | — | 20.1% | — |

Subjecting the above data to the binomial distribution method of analysis utilized by the Supreme Court in *Castaneda v. Partida,* *supra,* and *Hazelwood School District v. United States, supra,* it is determined that

the standard deviation [12] for each job category in each year is as follows:

| Category | Year | Standard Deviation |
|---|---|---|
| Officials and Managers | '73 | 2.2 |
| Officials and Managers | '74 | 2.8 |
| Officials and Managers | '75 | 3.1 |
| Officials and Managers | '76 | 3.1 |
| Professionals | '73 | 2.6 |
| Professionals | '74 | 3.2 |
| Professionals | '75 | 3.3 |
| Professionals | '76 | 4.2 |
| Technicians | '73 | 1.4 |
| Technicians | '74 | 1.9 |
| Technicians | '75 | 2.3 |
| Technicians | '76 | 2.4 |
| Office and Clerical | '73 | 6.7 |
| Office and Clerical | '74 | 8.2 |
| Office and Clerical | '75 | 8.0 |
| Office and Clerical | '76 | 7.9 |
| Craftsmen | '73 | — |
| Craftsmen | '74 | 1.0 |
| Craftsmen | '75 | 1.0 |
| Craftsmen | '76 | .8 |
| Operatives | '73 | — |
| Operatives | '74 | .6 |
| Operatives | '75 | 1.0 |
| Operatives | '76 | — |

A standard deviation is essentially a measurement of fluctuation from an expected result. Within limits fluctuation is expected and is quite natural. A standard deviation is a unit of measurement plus or minus from the expected. For example in the Officials and Managers job category for 1973, one would expect to find that 5 of the 121 employees were minorities. The standard deviation for that job category and year, as computed earlier, is 2.2. If one discovered that the company actually employed either 3 minorities or 7 minorities in that sample of 121 employees, one would say that the observed number of employees was within one standard deviation. For example, 5.2 (the expected) minus 2.2 (the standard deviation) equals 3 (the observed); 5.2 (the expected) plus 2.2 (the standard deviation) equals 7.4 which is greater than 7 (the observed). If one discovered that the company employed either 1 minority or 9

12. As indicated in *Castaneda v. Partida, supra*, at 497 n. 17, 97 S.Ct. at 1281 n. 17, 51 L.Ed.2d at 512 n. 17, the standard deviation is "defined for [a] binomial distribution as the square root of the product of the total number in the sample times the probability of selecting a [minority] times the probability of selecting a [non-minority]."

For example, utilizing the Officials and Managers job category for the year 1973, the relevant numbers are as follows. The sample is 121, the number of employees within the company at the Officials and Managers job category during the year 1973. The probability of selecting a minority is .043, the national average for minorities in the Officials and Managers job category for the year 1973 expressed as a decimal. The probability of selecting a non-minority is .957, the result reached by subtracting the probability of selecting a minority from 1. The sample (121), the probability of selecting a minority (.043), and the probability of selecting a non-minority (.957), are multiplied to yield a product (4.979271). The square root of the product yields the standard deviation for the Officials and Managers job category for 1973 (2.2). (Once the standard deviation has been determined, it is used to measure the difference between the observed and the expected. Following through on the same category and year, one determines that the difference between the

observed (3) and the expected (5.2) is 2.2. Dividing that difference by the standard deviation (2.2), one determines that there is one standard deviation between the observed and the expected.)

The calculations are as depicted below:

| | | | |
|---|---|---|---|
| Officials and Managers | '73 | $\sqrt{(121)\ (.043)\ (.957)}$ | = 2.2 |
| Officials and Managers | '74 | $\sqrt{(158)\ (.051)\ (.949)}$ | = 2.8 |
| Officials and Managers | '75 | $\sqrt{(197)\ (.051)\ (.949)}$ | = 3.1 |
| Officials and Managers | '76 | $\sqrt{(203)\ (.051)\ (.949)}$ | = 3.1 |
| Professionals | '73 | $\sqrt{(107)\ (.067)\ (.933)}$ | = 2.6 |
| Professionals | '74 | $\sqrt{(155)\ (.072)\ (.928)}$ | = 3.2 |
| Professionals | '75 | $\sqrt{(162)\ (.072)\ (.928)}$ | = 3.3 |
| Professionals | '76 | $\sqrt{(260)\ (.072)\ (.928)}$ | = 4.2 |
| Technicians | '73 | $\sqrt{(21)\ (.098)\ (.902)}$ | = 1.4 |
| Technicians | '74 | $\sqrt{(42)\ (.098)\ (.902)}$ | = 1.9 |
| Technicians | '75 | $\sqrt{(62)\ (.092)\ (.908)}$ | = 2.3 |
| Technicians | '76 | $\sqrt{(71)\ (.092)\ (.908)}$ | = 2.4 |
| Office and Clerical | '73 | $\sqrt{(463)\ (.109)\ (.891)}$ | = 6.7 |
| Office and Clerical | '74 | $\sqrt{(693)\ (.109)\ (.891)}$ | = 8.2 |
| Office and Clerical | '75 | $\sqrt{(706)\ (.102)\ (.898)}$ | = 8.0 |
| Office and Clerical | '76 | $\sqrt{(684)\ (.102)\ (.898)}$ | = 7.9 |
| Craftsmen | '73 | ----------------- | |
| Craftsmen | '74 | $\sqrt{(10)\ (.103)\ (.897)}$ | = 1.0 |
| Craftsmen | '75 | $\sqrt{(12)\ (.091)\ (.909)}$ | = 1.0 |
| Craftsmen | '76 | $\sqrt{(7)\ (.091)\ (.909)}$ | = .8 |
| Operatives | '73 | ----------------- | |
| Operatives | '74 | $\sqrt{(2)\ (.224)\ (.776)}$ | = .6 |
| Operatives | '75 | $\sqrt{(6)\ (.201)\ (.799)}$ | = 1.0 |
| Operatives | '76 | ----------------- | |

minorities in that sample of 121 employees, one would say that the observed number of employees was within two standard deviations. Again, for example, 5.2 (the expected) minus 4.4 (two times the value of one standard deviation) equals .8 which is less than 1 (the observed); 5.2 (the expected) plus 4.4 (two times the value of one standard deviation) equals 9.6 which is greater than 9 (the observed).

Comparing the standard deviation with the observed and expected in each job category for each year and utilizing the variations recognized by the Supreme Court in *Castaneda, supra,* and *Hazelwood School District, supra,* it appears that the hypothesis that Officials and Managers, Professionals and Technician job categories were a result of an unbiased selection from the population at large would not be subject to doubt.

Specifically the results of comparing the expected with the observed for each job category and year are set out below.

| Officials and Managers | '73 | one standard deviation. |
| Officials and Managers | '74 | just over one standard deviation. |
| Officials and Managers | '75 | less than one standard deviation. |
| Officials and Managers | '76 | just over one standard deviation. |
| Professionals | '73 | just over one standard deviation. |
| Professionals | '74 | just over one standard deviation. |
| Professionals | '75 | less than one standard deviation. |
| Professionals | '76 | less than one standard deviation. |
| Technicians | '73 | less than one standard deviation. |
| Technicians | '74 | less than one standard deviation. |
| Technicians | '75 | just over one standard deviation. |
| Technicians | '76 | just over one standard deviation. |
| Office and Clerical | '73 | less than one standard deviation. |
| Office and Clerical | '74 | three standard deviations. |
| Office and Clerical | '75 | four and one-half standard deviations. |
| Office and Clerical | '76 | between three and four standard deviations. |
| Craftsmen | '73 | - - - - - - - - - - - - - - - |
| Craftsmen | '74 | three standard deviations. |
| Craftsmen | '75 | within five standard deviations. |
| Craftsmen | '76 | within three standard deviations. |
| Operatives | '73 | - - - - - - - - - - - - - - - |
| Operatives | '74 | within three standard deviations. |
| Operatives | '75 | within one standard deviation. |
| Operatives | '76 | - - - - - - - - - - - - - - - |

Obviously the samples are so small in the Craftsmen and Operatives job categories that little or no significance can be attributed to those calculations. *See Teamsters, supra,* n. 20. While the hypothesis that the Office and Clerical personnel were the result of random selection from the population is questionable, there can be no mistake that any bias present *favored* rather than discriminated against minority personnel.

There can be little doubt that in attempting to determine whether class discrimination might exist in the entire employment structure of the defendant, the appropriate test is to compare the personnel structure, existing during the time period for which the statute of limitations for racial discrimination has not expired, with the available work force in the specific job categories during those relevant years. *Patterson v. American Tobacco Co.,* 535 F.2d 257,

275 (4th Cir. 1976). *See also Hazelwood School District v. United States, supra.* It appears from an examination of the above statistics that the personnel employed at R. J. Reynolds Industries from 1973 through June 1976 were selected without any bias against persons of minority races.[13] Therefore, it appears that no common questions of law or fact are present, that typicality of claims is lacking, and that there is no evidence that the defendant has acted on grounds generally applicable to the purported class. Nevertheless, the Court will proceed further to analyze the remaining data.

The following is a summary of the data available on the Industries' applicants, new hires, and promotions during 1973, 1974, 1975 and 1976.

### 1973

*Applicants:* 31.3% of the 2,108 applicants were racial minorities (660 racial minorities and 1,448 non-minorities).

*New Hires:* 19.4% of the 386 newly hired personnel were racial minorities (75 racial minorities and 311 non-minorities). This is further analyzed as follows: 6 of 30 newly hired Professionals (20%) were minorities; 69 of 356 newly hired Office and Clerical personnel (19.4%) were minorities.

*Promotions:* 9% of the 166 employees promoted were racial minorities (15 racial minorities and 151 non-minorities). This is further analyzed as follows: 2 of 43 Officials and Managers promoted (4.7%) were minorities; 0 of 7 Technicians promoted (0%) was a minority; 11 of 75 Office and Clerical personnel (14.7%) were minorities.

### 1974

*Applicants:* 23.8% of the 1,448 applicants were racial minorities (345 racial minorities and 1,103 non-minorities).

**13.** As previously mentioned in the high level job categories, it appears that the employment structure was the result of an unbiased selection from the available work forces. In the

*New Hires:* 18.3% of the 224 newly hired personnel were racial minorities (41 racial minorities and 183 non-minorities). This is further analyzed as follows: 0 of 1 newly hired Officials and Managers (0%) was a racial minority; 3 of 34 newly hired Professionals (8.8%) were racial minorities; 4 of 10 newly hired Technicians (40%) were racial minorities; 34 of 178 newly hired Office and Clerical personnel (19.1%) were racial minorities; 0 of 1 newly hired Craftsmen (0%) was a racial minority.

*Promotions:* 10.4% of the 259 persons promoted were racial minorities (27 racial minorities and 232 non-minorities). This is further analyzed as follows: 0 of 44 Officials and Managers promoted (0%) was a racial minority; 1 of 39 Professionals promoted (2.6%) was a racial minority; 1 of 15 Technicians promoted (6.6%) was a racial minority; 23 of 155 Office and Clerical personnel promoted (14.8%) were racial minorities; 1 of 3 Craftsmen promoted (33.3%) was a racial minority; 1 of 3 Operatives promoted (33.3%) was a racial minority.

### 1975

*Applicants:* 19.2% of the 1,913 applicants were racial minorities (367 racial minorities and 1,546 non-minorities).

*New Hires:* 17.8% of the 196 newly hired personnel were racial minorities (35 racial minorities and 161 non-minorities). This is further analyzed as follows: 0 of 8 newly hired Officials and Managers (0%) was a racial minority; 3 of 35 newly hired Professionals (8.5%) were racial minorities; 0 of 5 newly hired Technicians (0%) was a racial minority; 32 of 147 newly hired Office and Clerical personnel (21.8%) were racial minorities; 0 of 1 newly hired Operatives (0%) was a racial minority.

Office and Clerical job category it appears that racial minorities actually received preference in employment opportunity.

*Promotions:* 10% of the 241 persons promoted were racial minorities (24 racial minorities and 217 non-minorities). This is further analyzed as follows: 4 of 60 Officials and Managers promoted (6.8%) were racial minorities; 2 of 64 Professionals promoted (3.1%) were racial minorities; 2 of 14 Technicians promoted (14.3%) were racial minorities; 16 of 103 Office and Clerical personnel promoted (15.5%) were racial minorities.

### 1976

*Applicants:* 16.4% of the 1,245 applicants were racial minorities (204 racial minorities and 1,041 non-minorities).

*New Hires:* 5.4% of the 74 newly hired personnel were racial minorities (4 racial minorities and 70 non-minorities). This is further analyzed as follows: 0 of 5 newly hired Officials and Managers (0%) was a racial minority; 0 of 27 newly hired Professionals (0%) was a racial minority; 1 of 9 newly hired Technicians (11.1%) was a racial minority; 3 of 32 newly hired Office and Clerical personnel (9.4%) were racial minorities; 0 of 1 newly hired craftsworkers (0%) was a racial minority.

*Promotions:* 10.6% of the 113 employees promoted were racial minorities (12 racial minorities and 101 non-minorities). This is further analyzed as follows: 1 of 23 Officials and Managers promoted (4.4%) was a racial minority; 3 of 34 Professionals promoted (8.8%) were racial minorities; 0 of 3 Technicians promoted (0%) was a racial minority; 8 of 52 Office and Clerical personnel promoted (15.4%) were racial minorities; 0 of 1 Craftsworkers promoted (0%) was a racial minority.

### Analysis of Hired & Promoted 1973–76

*Officials and Managers:* While 0 of 14 newly hired personnel in this job category (0%) was a racial minority, 9 of 170 personnel promoted (5.3%) were racial minorities. Because the number of newly hired personnel is very small (only one of the next six persons hired would have to be a racial minority for the national average to be met) and because the percentage of minority promotions in this job category exceeds the national average of minority employees in this job category (73–76 average of 4.9%) this data does not cast doubt on the conclusion reached by use of the binomial distribution analysis.

*Professionals:* 12 of 126 newly hired Professionals (9.5%) were racial minorities and 8 of 178 Professionals promoted (4.5%) were racial minorities. Since these figures are close to the national average of minority employees in this job category (73–76 average 7.07%), each within 2.5% of the national average, no reason exists to doubt the results obtained by use of the binomial distribution analysis.

*Technicians:* 5 of 24 newly hired Technicians (20.8%) and 3 of 39 promoted Technicians (7.7%) were racial minorities. These figures give no basis to doubt the conclusion reached by utilizing the binomial distribution analysis.

*Office and Clerical:* 138 of 713 newly hired Office and Clerical personnel (19.4%) and 58 of 369 Office and Clerical personnel promoted (15.7%) were racial minorities. These figures support the conclusion previously reached that any bias present in this job category favors racial minorities.

*Craftsmen & Operatives:* 0 of 2 newly hired Craftsmen and 1 of 4 Craftsmen promoted were racial minorities; 0 of 1 newly hired Operatives and 1 of 3 Operatives promoted were racial minorities. The size of these samples are so small that the data is of little significance and therefore cannot be considered.

Plaintiffs wish this Court to focus almost exclusively on the fact that the percentage of minority applicants always exceeded the percentage of minority new hires in each year. However, none of plaintiffs or intervenors were denied initial employment. Their only common link is they have left the company. Thus the evidence concern-

ing minority *applicants* has little to do with plaintiffs' area of interest and claimed injury in this suit. In addition, in determining equal access to jobs, courts often rely on a comparison between the work force and the work population of an area as the more reliable method of analysis. *Robinson v. Union Carbide Corp.*, 538 F.2d 652, 657 (5th Cir. 1976), *modified on other grounds*, 544 F.2d 1258 (5th Cir. 1977), *cert. denied*, 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977).

The plaintiffs also argue that because no minorities were employed in four departments of R. J. Reynolds Industries as of June 30, 1976, segregated departments were present and that segregated departments are strong evidence of discrimination. The following chart shows each department of defendant, the number of persons employed, the percentage of minority employees, and the number of minority employees as of June 30, 1976.

| | Department | Number of Employees | Percentage Minorities | Number of Minorities |
|---|---|---|---|---|
| 1. | Executive | 14 | 0 | 0 |
| 2. | Legal | 30 | 6.7% | 2 |
| 3. | Secretary | 29 | 3.4% | 1 |
| 4. | Comptroller | 673 | 12.5% | 84 |
| 5. | Treasurers | 277 | 10.1% | 28 |
| 6. | Business Planning and Development | 20 | 0 | 0 |
| 7. | Credit Union | 22 | 27.3% | 6 |
| 8. | Corporate Research | 4 | 0 | 0 |
| 9. | Public Affairs | 5 | 0 | 0 |
| 10. | Personnel | 88 | 4.5% | 4 |
| 11. | Public Relations | 64 | 9.4% | 6 |
| | TOTAL | 1,226 | 10.67% | 131 |

Plaintiffs' claim that because four departments (whose total number of employees is 43 out of a total work force of 1,226—3.5%) do not contain any minority personnel, strong evidence exists to indicate that the defendant discriminates in its employment practices. This argument cannot be taken seriously in view of the earlier analysis of the personnel structure—job category by job category—which supports the proposition that the employee structure was the result of a selection process which did not contain a bias against racial minorities. More importantly, the Court is at a loss to understand how plaintiffs think these facts concern them. They have shown no employment entitlement or interest in these four departments.

■ In light of the results reached by use of the binomial distribution analysis in examining the available data, and in light of the absence of other evidence which would cast doubt upon such results, this Court concludes that the plaintiffs have failed to show any reasonable inference of across-the-board discrimination, and hence have failed to satisfy the requirements of Rules 23(a)(2), 23(a)(3), and 23(b)(2), Federal Rules of Civil Procedure. Therefore, even if the plaintiffs were not limited by their interests as to who they could represent, *see* p. 31, *supra*, an examination of the employment statistics indicate that across-the-board class certification would be improper.

Nor can plaintiffs represent lesser classes. Holden was never employed by defendant R. J. Reynolds Industries and therefore cannot represent a class of which she was not a member. *East Texas Motor Freight System, Inc. v. Rodriguez, supra.* In any lesser

class Garrett or Singletary might represent, the numerosity requirement of Rule 23, Federal Rules of Civil Procedure, would not be met. *See* discussion at p. 31, *supra.*

The Court notes that in ruling on the class action issue it did not consider the merits of the individual claims asserted by the plaintiffs. The plaintiffs are entitled to resolve those claims, each in their individual manner. *See, Doctor v. Seaboard Coast Line R. Co., supra.* Nor does this ruling have any res judicata effect on racial discrimination claims that members of the proposed class have or may have in the future. *Roman v. ESB, Inc.,* 550 F.2d 1342 (4th Cir. 1976).

### Plaintiffs' Motion to Add Tobacco as a Party and Defendant's Motion to Dismiss or for Summary Judgment

Plaintiffs seek to amend their complaint in *Garrett v. Industries* to add R. J. Reynolds Tobacco Company (Tobacco) as a party-defendant. Only plaintiff Holden was ever a Tobacco employee. After being hired as a temporary employee of Industries on January 8, 1975, Holden became a regular Tobacco employee from February 3, 1975, until her discharge on July 7, 1975. Her EEOC charge named only Industries. While plaintiffs claim that Holden should have had a job at Industries, this was not based on any specific claim of entitlement. Rather, plaintiffs merely rely on the fact that Industries was initially staffed with Tobacco employees and has continued to accept such employees, as services are consolidated. *See* Plaintiffs' Supplemental Memorandum (November 29, 1977) at p. 9. Contrary to plaintiffs' claim, the evidence does not show Tobacco is the mere agent of Industries in personnel or other matters. *Contrast Hairston v. McLean Trucking Co.,* 62 F.R.D. 642 (M.D.N.C.1974), *vacated and remanded on other grounds,* 520 F.2d 226 (4th Cir. 1975). Additionally, plaintiff Holden has identified no class of individuals

who have claims typical of her own. Thus, to the extent that she seeks to represent a class of persons consisting of minority Tobacco employees, there is no basis for such a certification. Because Holden never filed an EEOC complaint against Tobacco, this Court may have no jurisdiction, either in the *Garrett* or the *Holden* actions, to entertain an action under Title VII as to Tobacco. Holden's only complaint against Industries is that she was not transferred there from Tobacco. This was raised in briefs, not the complaint. In her complaint, her contention is that she was unlawfully discharged.

The Court will deny plaintiffs' motion to add Tobacco as a party-defendant in *Garrett v. Industries.* However, plaintiff Ramona Holden may move to add and substitute Tobacco in *Holden v. Industries. See* p. 51 *infra.* If Holden is successful in adding Tobacco, her action will proceed separately. Of course, if Holden moves to add Tobacco, the company may oppose it. The Court will not allow plaintiff Holden to proceed against defendant Industries.

### Discovery Motions—Garrett v. Industries

 The denial of class certification essentially moots the discovery controversies in this suit, although the Court will sustain the defendant's objections.

At an earlier hearing the Magistrate ordered the defendant to fully answer Interrogatory 9(c), Plaintiffs' First Interrogatories addressed to Industries. To fully comply required the defendant to provide a wage history of each supervisor and employee below the rank of supervisor who was employed by defendant during the period January 1, 1973, through June 30, 1976. The defendant appealed the Magistrate's ruling, claiming that it did not have the requested information readily available and that to require the defendant to compile that data would be an excessively burdensome task.[14]

---

14. It appears that plaintiff already has enough data to perform such an analysis. *See* n. 8,

*supra.* Moreover, on the evidence presented here, it is unlikely that plaintiffs can require

Further discovery motions were filed by the plaintiffs at the November 23, 1976, hearing which was scheduled for arguments on the class certification issue. The defendant objected to all this discovery on the grounds that it was untimely. Nevertheless, at the urging of the Court to resolve all discovery matters without the Court's assistance, the defendant provided all requested information with some exceptions.

The defendant preserved its legal objection contending that the plaintiffs were entitled to no further discovery until the class certification issue was resolved. The defendant did not provide (1) the wage history of each of its employees, (2) its Quarterly Minority and Female Goals Report for 1973 through 1976, (3) its test score results by race, and its validation studies of the Otis Self-Administering Test, (4) its EEO-1 and EEO-4 reports for the years 1973–1976, and (5) its applicant flow reports for the years 1973–1976. In addition the defendant takes exception to the plaintiffs' attempt to compel it to compile and produce the educational background of each of its employees.

The local rules regarding class certification (specifically Local Rule 17(b)(3)) preclude a plaintiff from filing further discovery motions concerning the class action aspects of the case after the expiration of the time limit by which the plaintiff must move for class certification. This, of course, is in the absence of either a finding by the Court that a class exists or that good cause exists to extend the time limit enunciated in Local Rule 17(b)(3).

Sustaining defendant's discovery objections does not have the effect of denying the plaintiffs the ability to establish their case. Nothing herein contravenes the discovery principles enunciated in *McDonald Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) or *Graniteville Co. (Sibley Div.) v. Equal Employment Opportunity Com'n.*, 438 F.2d 32 (4th Cir. 1971). Rather, the Court is simply saying

that the plaintiffs have had enough discovery. If class wide racial discrimination were present, the evidence already provided to the plaintiffs would indicate its existence. Surely where the evidence fails to point to any type of class discrimination, the plaintiffs have no right to continue to extract irrelevant information from the defendant. This is a fair way to resolve the competing interests. For just as the plaintiffs have the right to discover toward and prove the existence of discrimination, the defendant has the right not to be subjected to needless, imprecise, and arbitrary discovery.

### Motion to Intervene—Garrett v. Industries

On December 1, 1977, Clara Pinkney and Robert Burt filed a motion asking leave of this Court to intervene in *Garrett v. Industries*, C–75–539–WS. They asserted that they were former employees of defendant, that they had been adversely affected by defendant's discriminatory employment practices, and that if they were not allowed to intervene their ability to protect their interests would possibly be impaired or impeded.

Because the Court declines to grant the plaintiffs' motion for class certification, Pinkney and Burt have no interest which could be impaired by this action. Therefore, their motion to intervene is denied.

### Holden v. Industries

Having reviewed the procedural history and ruled on *Garrett v. Industries*, it should be somewhat easier to resolve the matters outstanding in *Holden v. Industries*, C–76–176–WS.

On May 21, 1976, the plaintiffs in *Holden* moved to certify their class. As in *Garrett*, the plaintiffs requested that the certification be delayed pending the completion of "all" discovery. On May 27, 1976, the de-

defendant to perform the computation and analysis at defendant's expense. *Cf. Oppen-*

*heimer Fund, Inc. v. Sanders*, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978).

fendant moved for summary judgment on individual claims of Holden on the grounds that she was not an employee of Industries during the period alleged in the complaint.

At the initial pretrial conference held before Magistrate Smith on June 16, 1976, the defendant was ordered to answer certain interrogatories. Defendant appealed from the ruling requiring it to answer one specific interrogatory on the grounds that the interrogatory was overly burdensome. This interrogatory is identical to the interrogatory [Interrogatory 9C] that the defendant appealed in *Garrett v. Industries.*

On October 14, 1976, the plaintiffs served interrogatories and requests for production directed toward R. J. Reynolds Tobacco Co. (Tobacco). However, Tobacco was not a party to this suit nor had a motion been made to add Tobacco to the suit as was done in *Garrett v. Industries.* A hearing on the issue of class certification was conducted on November 23, 1976, and as was the case with *Garrett v. Industries,* numerous discovery requests and motions were filed.[15] At the hearing this case was handled with *Garrett v. Industries,* and the stipulation of issues subsequently filed on December 15, 1976, included a breakdown of matters in conflict in this suit.

The motion to depose Mr. Bass filed on March 7, 1977, and the Court's order of August 12, 1977, relative thereto applied to *Holden v. Industries* even though as previously noted no effort had been made to add Tobacco to this suit. Subsequently on December 1, 1977, Clara Pinkney and Robert Burt filed a motion to intervene in this action.

Thus in *Holden v. Industries,* C-76-176-WS, the following items require the attention of the Court:

(1) Plaintiffs' Motion for Class Certification.

(2) Defendant's Motion to Dismiss Holden's Claims.

(3) Plaintiffs' and Defendant's various Discovery Motions.

(4) Pinkney and Burt's Motion to Intervene.

(5) Whether *Holden v. Industries,* C-76-176-WS, should be consolidated with *Garrett v. Industries,* C-75-539-WS.

### Motion for Class Certification—Holden v. Industries

Plaintiffs' request for class certification concerning their claims of racial discrimination in *Holden v. Industries* involves the same evidence considered in *Garrett v. Industries.* Thus the Court concludes here that plaintiffs have not satisfied Rule 23 and may only prosecute their individual claims. Additionally plaintiffs have likewise failed to show any commonality or typicality between their claims and those of other females. Rather they have relied mostly on conclusory allegations to establish their contentions of across-the-board sex discrimination. Nevertheless, the Court will again analyze each of defendant's job categories to demonstrate the lack of foundation for plaintiffs' broad class claims of sex discrimination.

Plaintiffs' claims of sex discrimination are actionable only under 42 U.S.C. § 2000e and the class is limited to claims which arose subsequent to 180 days prior to the date Singletary's EEOC charge was filed.[16] 42 U.S.C. § 2000e-5(e); *United Airlines Inc. v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977); *Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239 (3rd Cir.), *cert.*

---

15. The discovery requests and motions filed in *Holden v. Industries* at the November 23, 1976, hearing are as follows: Plaintiffs' Second Interrogatories; Plaintiffs' Second Request for Production; Motion to Compel Answers to Interrogatories; Motion to Compel Production of Documents; Memorandum in Support of Motion to Compel Production and Motion to Compel Defendant to Answer Interrogatories; and

Plaintiffs' Supplemental Memorandum in Response to Defendant's Opposition to Class Certification.

16. Since the evidence shows Holden was never employed by Industries, the proper date would not be July 1, 1975, the date Holden filed her complaint with EEOC but rather July 7, 1975, the date Singletary filed her EEOC complaint.

*denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

The plaintiffs have argued that in the 42 U.S.C. § 2000e aspects of this suit they are entitled to represent those persons whose claims arose within two years of the filing of the EEOC complaint. This argument misreads the law. The two-year limitation period found in 42 U.S.C. § 2000e–5(g) limits the amount of back pay a person with an actionable claim may recover. It does not, however, control as to which claims are actionable. That aspect of the statute is found in 42 U.S.C. § 2000e–5(e) which requires that for a claim to be actionable an EEOC complaint must be filed within 180 days of the alleged unlawful employment practice. *See United Airlines v. Evans, supra.*

The Court now turns its attention to analyzing the mass of statistical data present in the file concerning the claims of discrimination based on sex. The evidence presented in the file and submitted to the Court for *in-camera* review shows the composition of the work force at Reynolds Industries from 1973, through June 1976, and how that work force relates to the National Average for females in the high level job categories and to the Greensboro, High Point, and Winston-Salem Metropolitan Average for females in the remaining job categories. The file also contains statistical data concerning the number and percentage of females who applied for employment, the number and percentage of females who were hired in the various job categories, and the number and percentage of females who were promoted within the various job categories at Industries from 1973, through June 1976.

As indicated in *Garrett v. Industries*, at sometime from January 1, 1973, through June 30, 1976, the following job categories were present in the R. J. Reynolds Industries employment structure:

(1) Officials and Managers

(2) Professionals

(3) Technicians

(4) Office and Clerical

(5) Craftsmen (skilled)

(6) Operatives (semi-skilled)

The following tables show the job classifications and indicate the number and percentage of females employed in that particular job classification for the years 1973, 1974, 1975 and 1976 (through June 30, 1976).[17] The tables also show the percentage of females existing in the work force and the number that would have been employed if that percentage were exactly met (*i. e.* the expected) as compiled by use of the National Average for Females or the Greensboro, High Point, Winston-Salem Metropolitan Average for Females.

### JOB CATEGORY—Officials and Managers

| Year (a) | Females Employed Over Total Employed (b/c) | Percent Females Employed (d) | National Percent Females (e) | Females Expected if National Average Met (f) (f = e x c) |
|---|---|---|---|---|
| 73 | 5/121 | 4.1% | 11.9% | 14.4 |
| 74 | 8/158 | 5.1% | 13.1% | 20.7 |
| 75 | 18/197 | 9.1% | 13.1% | 25.8 |
| 76 | 21/203 | 10.3% | 13.1% | 26.6 |

17. Hereafter the date 1976 when used with statistics will mean only through June 30, 1976, unless otherwise indicated.

## Professionals

| Year (a) | Females Employed Over Total Employed (b/c) | Percent Females Employed (d) | National Percent Females (e) | Females Expected if National Average Met (f) (f = e x c) |
|---|---|---|---|---|
| 73 | 11/107 | 10.3% | 27.8% | 29.7 |
| 74 | 22/155 | 14.2% | 28.2% | 43.7 |
| 75 | 31/162 | 19.1% | 28.2% | 45.7 |
| 76 | 67/260 | 25.8% | 28.2% | 73.3 |

## Technicians

| Year (a) | Females Employed Over Total Employed (b/c) | Percent Females Employed (d) | Metropolitan Percent Females (e) | Females Expected if Metropolitan Average Met (f) (f = e x c) |
|---|---|---|---|---|
| 73 | 4/21 | 19% | 27.7% | 5.8 |
| 74 | 10/42 | 23.8% | 27.7% | 11.6 |
| 75 | 15/62 | 24.2% | 27.7% | 17.2 |
| 76 | 15/71 | 21.1% | 27.7% | 19.7 |

## Office and Clerical

| Year (a) | Females Employed Over Total Employed (b/c) | Percent Females Employed (d) | Metropolitan Percent Females (e) | Females Expected if Metropolitan Average Met (f) (f = e x c) |
|---|---|---|---|---|
| 73 | 380/463 | 82.1% | 73.6% | 340.8 |
| 74 | 591/693 | 85.3% | 73.6% | 510. |
| 75 | 617/706 | 87.4% | 73.6% | 519.6 |
| 76 | 609/684 | 89% | 73.6% | 503.4 |

### JOB CATEGORY—Officials and Managers

#### Craftsmen (Skilled)

| Year | Females Employed Over Total Employed | Percent Females Employed | Metropolitan Percent Females | Females Expected if Metropolitan Average Met |
|------|------|------|------|------|
| (a) | (b/c) | (d) | (e) | (f) $(f = e \times c)$ |
| 73 | 0/0 | — | 6.9% | — |
| 74 | 2/10 | 20% | 6.9% | .7 |
| 75 | 2/12 | 16.7% | 7.2% | .9 |
| 76 | 3/7 | 42.9% | 7.2% | .5 |

#### Operatives (Semi-Skilled)

| Year | Females Employed Over Total Employed | Percent Females Employed | Metropolitan Percent Females | Females Expected if Metropolitan Average Met |
|------|------|------|------|------|
| (a) | (b/c) | (d) | (e) | (f) $(f = e \times c)$ |
| 73 | 0/0 | — | 55.2% | — |
| 74 | 0/2 | 0% | 55.2% | 1.1 |
| 75 | 0/6 | 0% | 55.4% | 3.3 |
| 76 | 0/0 | — | 55.4% | — |

Subjecting the above data to the binomial distribution method of analysis, the standard deviation [18] for each job category in each year is determined as follows:

| Category | Year | Standard Deviation |
|------|------|------|
| Officials and Managers | '73 | 3.6 |
| Officials and Managers | '74 | 4.2 |
| Officials and Managers | '75 | 4.7 |
| Officials and Managers | '76 | 4.8 |

| Category | Year | Standard Deviation |
|------|------|------|
| Professionals | '73 | 4.6 |
| Professionals | '74 | 5.6 |
| Professionals | '75 | 5.7 |
| Professionals | '76 | 7.3 |
| Technicians | '73 | 2.1 |
| Technicians | '74 | 2.9 |
| Technicians | '75 | 3.5 |
| Technicians | '76 | 3.8 |

18. The calculations are as depicted below:

| | | |
|------|------|------|
| Officials and Managers | '73 | $\sqrt{(121)\ (.119)\ (.881)} = 3.6$ |
| Officials and Managers | '74 | $\sqrt{(158)\ (.131)\ (.869)} = 4.2$ |
| Officials and Managers | '75 | $\sqrt{(197)\ (.131)\ (.869)} = 4.7$ |
| Officials and Managers | '76 | $\sqrt{(203)\ (.131)\ (.869)} = 4.8$ |
| Professionals | '73 | $\sqrt{(107)\ (.278)\ (.722)} = 4.6$ |
| Professionals | '74 | $\sqrt{(155)\ (.282)\ (.718)} = 5.6$ |
| Professionals | '75 | $\sqrt{(162)\ (.282)\ (.718)} = 5.7$ |
| Professionals | '76 | $\sqrt{(260)\ (.282)\ (.718)} = 7.3$ |
| Technicians | '73 | $\sqrt{(21)\ (.277)\ (.723)} = 2\ 1$ |
| Technicians | '74 | $\sqrt{(42)\ (.277)\ (.723)} = 2.9$ |
| Technicians | '75 | $\sqrt{(62)\ (.277)\ (.723)} = 3.5$ |
| Technicians | '76 | $\sqrt{(71)\ (.277)\ (.723)} = 3.8$ |
| Office and Clerical | '73 | $\sqrt{(463)\ (.736)\ (.264)} = 9.5$ |
| Office and Clerical | '74 | $\sqrt{(693)\ (.736)\ (.264)} = 11.6$ |
| Office and Clerical | '75 | $\sqrt{(706)\ (.736)\ (.264)} = 11.7$ |
| Office and Clerical | '76 | $\sqrt{(684)\ (.736)\ (.264)} = 11.5$ |
| Craftsmen | '73 | ------ |
| Craftsmen | '74 | $\sqrt{(10)\ (.069)\ (.931)} = .8$ |
| Craftsmen | '75 | $\sqrt{(12)\ (.072)\ (.928)} = .9$ |
| Craftsmen | '76 | $\sqrt{(7)\ (.072)\ (.928)} = .7$ |
| Operatives | '73 | ------ |
| Operatives | '74 | $\sqrt{(2)\ (.552)\ (.448)} = .7$ |
| Operatives | '75 | $\sqrt{(6)\ (.554)\ (.446)} = 1.2$ |
| Operatives | '76 | ------ |

| Category | Year | Standard Deviation |
|---|---|---|
| Office and Clerical | '73 | 9.5 |
| Office and Clerical | '74 | 11.6 |
| Office and Clerical | '75 | 11.7 |
| Office and Clerical | '76 | 11.5 |
| Craftsmen | '73 | — |
| Craftsmen | '74 | .8 |
| Craftsmen | '75 | .9 |
| Craftsmen | '76 | .7 |
| Operatives | '73 | — |
| Operatives | '74 | .7 |
| Operatives | '75 | 1.2 |
| Operatives | '76 | — |

Comparing the standard deviation with the observed and expected in each job category for each year, it appears that the hypothesis that the Officials and Managers, Professionals,[19] Technicians, and Craftsmen employed during the relevant time period (1975 and 1976) were the result of unbiased selections from the population at large is acceptable and would not be subject to doubt. The Office and Clerical job category possibly shows a bias in favor of females.

Specifically, the results of comparing the expected with the observed for each job category and year are set out below:

| | | |
|---|---|---|
| Officials and Managers | '73 | between two and three standard deviations. |
| Officials and Managers | '74 | three standard deviations. |
| Officials and Managers | '75 | less than two standard deviations. |
| Officials and Managers | '76 | less than two standard deviations. |
| Professionals | '73 | just over four standard deviations. |
| Professionals | '74 | just less than four standard deviations. |
| Professionals | '75 | between two and three standard deviations. |
| Professionals | '76 | within one standard deviation. |
| Technicians | '73 | within one standard deviation. |
| Technicians | '74 | within one standard deviation. |
| Technicians | '75 | within one standard deviation. |
| Technicians | '76 | just over one standard deviation. |
| Office and Clerical | '73 | just over four standard deviations. |
| Office and Clerical | '74 | almost seven standard deviations. |
| Office and Clerical | '75 | over eight standard deviations. |
| Office and Clerical | '76 | just over nine standard deviations. |
| Craftsmen | '74 | within two standard deviations. |
| Craftsmen | '75 | just over one standard deviation. |
| Craftsmen | '76 | just over three standard deviations. |
| Operatives | '75 | just over one standard deviation. |
| Operatives | '76 | between two and three standard deviations. |

Obviously the samples are so small in the Craftsmen and Operatives job category that little or no significance can be attributed to those calculations. While the hypothesis that the Office and Clerical personnel employed were the result of random selection from the relevant population cannot be accepted, there can be no mistake that any bias present favored rather than discriminated against females. Certainly the hypothesis that during the years 1973 to 1976 the Officials and Managers and the Technicians job categories were the result of an unbiased selection from the population is

19. While some questions exist concerning the Professional job category during 1973 and 1974, any sex discrimination which took place during those years is time barred. *United Airlines v. Evans, supra.* As previously noted, the class the plaintiffs seek to represent can extend no further back in time than 180 days prior to July 7, 1975.

not rejected based on the analysis of this data. The hypothesis that during the years 1973 to 1976 the employees in the Professional Job Category were the result of a random selection from the population is questionable because of the results reached for the years 1973 and 1974. However, no evidence of common questions of law or fact or of typicality of claims is presented by the data for the years 1975 and 1976 which, of course, is the period which would be actionable in this suit. The data for the two previous years (more than 180 days prior to the filing of Singletary's EEOC complaint), serves only to alert the Court to proceed cautiously in analyzing that job category. Certainly taking the personnel structure of the company in its entirety, this case does not present gross evidence of discrimination. However, further analysis will be undertaken.

The following is a summary of the data available on Industries applicants, new hires, and promotions during 1973, 1974, 1975, and 1976.

### 1973

*Applicants:* 60.2% of the 2,108 applicants were females (1,270 females and 838 males).

*New Hires:* 80.8% of the 386 newly hired personnel were females (312 females and 74 males). This is further analyzed as follows: 9 of 30 newly hired Professionals (30%) were females; 303 of 356 newly hired Office and Clerical personnel (85.1%) were females.

*Promotions:* 42.8% of the 166 employees promoted were females (71 females and 95 males). This data is further analyzed as follows: 4 of 43 Officials and Managers promoted (9.3%) were female; 8 of 41 Professionals promoted (19.5%) were female; 0 of 7 Technicians promoted (0%) was a female; 59 of 75 Office and Clerical personnel promoted (78.6%) were females.

### 1974

*Applicants:* 52.4% of the 1,448 applicants were females (759 females and 689 males).

*New Hires:* 72.8% of the 224 newly hired personnel were females (163 females and 61 males). This data is further analyzed as follows: 0 of 1 newly hired Officials and Managers (0%) was a female; 6 of 34 newly hired Professionals (17.6%) were females; 5 of 10 newly hired Technicians (50%) were females; 152 of 178 newly hired Office and Clerical personnel (85.4%) were female; 0 of 1 newly hired Craftsmen (0%) was a female.

*Promotions:* 58.7% of the 259 persons promoted were females (152 females and 107 males). This data is further analyzed as follows: 5 of the 44 Officials and Managers promoted (11.4%) were females; 7 of 39 Professionals promoted (17.9%) were females; 5 of the 15 Technicians promoted (33.3%) were females; 135 of 155 Office and Clerical personnel promoted (87.1%) were female; 0 of 3 Craftsmen promoted (0%) was a female; 0 of 3 Operatives promoted (0%) was a female.

### 1975

*Applicants:* 57.6% of the 1,913 applicants were females (1,101 females and 812 males).

*New Hires:* 64.3% of the 196 newly hired personnel were females (126 females and 70 males). This data is further analyzed as follows: 0 of 8 newly hired Officials and Managers (0%) was a female; 3 of 35 newly hired Professionals (8.6%) were females; 0 of 5 newly hired Technicians (0%) was a female; 123 of 147 newly hired Office and Clerical personnel (83.7%) were females; 0 of 1 newly hired Operatives was a female.

*Promotions:* 46.5% of the 241 persons promoted were females (112 females and 129 males). This data is further analyzed as follows: 10 of 60 Officials and Managers

promoted (16.7%) were females; 13 of 64 Professionals promoted (20.3%) were females; 2 of 14 Technicians promoted (14.3%) were females; 87 of 103 Office and Clerical personnel promoted (84.5%) were female.

### 1976

*Applicants:* 56.5% of the 1,245 applicants were females (703 females and 542 males).

*New Hires:* 50% of the 74 newly hired personnel were females (37 females and 37 males). This data is further analyzed as follows: 1 of 5 newly hired Officials and Managers (20%) was a female; 6 of 27 newly hired Professionals (22.2%) were females; 3 of 9 newly hired Technicians (33.3%) were females; 27 of 32 newly hired Office and Clerical personnel (84.4%) were females; 0 of 1 newly hired Craftsmen was a female.

*Promotions:* 58.4% of the 113 employees promoted were females (66 females and 47 males). This data is further analyzed as follows: 7 of the 23 Officials and Managers promoted (30.4%) were female; 12 of the 34 Professionals promoted (35.3%) were females; 0 of 3 Technicians promoted (0%) was a female; 46 of 52 Office and Clerical personnel promoted (88.5%) were female; 1 of 1 Craftsmen promoted (100%) was a female.

*Analysis of Hired and Promoted 1973–76*

*Officials and Managers:* While 1 of 14 newly hired personnel in this job category (7.1%) was a female, 26 of 170 personnel promoted in this job category (15.3%) were females. Although the percentage hired is short of the National Average of females available in this job category during these years (73–76 average 12.8%), the percentage promoted exceeds the national average. Considering the small number of newly hired personnel, this data presents no reason to doubt the tentative conclusion reached by use of the binomial distribution method of analysis of the Officials and Managers job category.

*Professionals:* 24 of 126 newly hired personnel in this job category (19%) were females and 40 of 178 personnel promoted in this job category (22.5%) were females. The proximity of these percentages to the National Average of females available in this job category during these years (73–76 average 28.1%) seems to negate any inference that positions within the Professionals job category were selected with a bias against females.

*Technicians:* 8 of 24 newly hired personnel in this job category (33.3%) were female and 7 of 39 personnel promoted in this category (17.9%) were females. The proximity of these percentages to the Metropolitan Average of females available in this job category during these years (73–76 average 27.7%) presents no reason to doubt the tentative conclusion reached by the use of the binomial distribution method of analysis of the Technicians job category.

*Office and Clerical:* 605 of 713 newly hired personnel in this job category (84.9%) were females and 327 of 385 personnel promoted in this category (84.9%) were females. These figures, when compared with the Metropolitan Average of females available in this job category during these years (73–76 average 73.6%), firmly supports the conclusion previously reached that there is no inference of discrimination against females in the Office and Clerical job category. Any bias present favors rather than harms females.

*Craftsmen:* 0 of 2 newly hired personnel in this job category (0%) was a female and 1 of 4 personnel promoted in this job category (25%) was a female. The small size of the sample and the small number of women available in the work force in this job category (73–76 average 7.05%) preclude any conclusion being drawn from this data.

*Operatives:* 0 of 1 newly hired personnel in this job category (0%) was a female and 0 of 3 of the personnel promoted in this job category (0%) was a female. Like the

Craftsmen job category, the sample in the Operatives job category is simply too small for any meaningful conclusion to be drawn.

Thus the evidence available regarding newly hired personnel and promoted personnel fails to cause the Court to conclude that the results reached by use of the binomial distribution method of analysis were incorrect.

Nor does analysis of department organizational structure within Industries as of June 30, 1976, provide any support for the position proffered by the plaintiffs.

| | Department | Number of Employees | Percentage Females | Number of Females |
|---|---|---|---|---|
| 1. | Executive | 14 | 64.3 | 9 |
| 2. | Legal | 30 | 50. | 15 |
| 3. | Secretary | 29 | 48.3 | 14 |
| 4. | Comptroller | 673 | 60.5 | 407 |
| 5. | Treasurers | 277 | 61 | 169 |
| 6. | Business Planning and Development | 20 | 25. | 5 |
| 7. | Credit Union | 22 | 63.6 | 14 |
| 8. | Corporate Research | 4 | 25. | 1 |
| 9. | Public Affairs | 5 | 40. | 2 |
| 10. | Personnel | 88 | 62.5 | 55 |
| 11. | Public Relations | 64 | 37.5 | 24 |
| | TOTAL | 1,226 | 58.3 | 715 |

■ The preceding analysis convinces the Court that the plaintiffs have not shown the existence of common questions of law or fact, that they have not shown that their claims are typical of the proposed class, and that they have failed to show that defendant has acted on grounds generally applicable to the class. Simply stated, the plaintiffs have failed to establish they are entitled to. represent an across-the-board class of "all female employees . . . ." Following the rationale explained in *Garrett v. Industries,* the class action aspects of this case are dismissed and the plaintiffs shall pursue the claims alleged in their individual actions.

■ Critics of this analytical approach to class certification will no doubt argue that the Court has ruled on the merits of these two suits. However, Judge Russell noted in *Doctor,* 540 F.2d at 708, that " 'on the merits' is an elusive term at best," and he recently explained in *Shelton,* 582 F.2d at 1312, that "[a]n intelligent decision on class certification requires 'at least a preliminary exploration of the merits' of the plaintiff's claim." This does not mean that the Court is ruling on the merits when it makes such exploration. The Court simply needs sufficient information (more than mere allegations) to make a reasonable and informed judgment on the issue of class certification. *Doctor v. Seaboard Coast Line R. R.,* 540 F.2d 699, 708 (4th Cir. 1976). In this memorandum opinion the Court has not found as a fact that individual blacks or individual females have or have not been discriminated against on the basis of their race or sex. As previously noted this ruling has no res judicata effect on whatever claims may be later presented. Rather the Court in this memorandum is saying that based on statistical analysis the plaintiffs have failed to establish for the purpose of class certification that blacks or females as a class are treated differently.

Rule 23 of the Federal Rules of Civil Procedure is intended as a device to further the administration of justice. It does not create a separate cause of action. Nor does a boiler-plate pleading of Rule 23 confer upon the plaintiff the right to present the claims of others. *See Belcher v. Bassett*

*Furniture Industries, Inc.*, 588 F.2d 904 (4th Cir. 1978). At the time a suit is filed the plaintiff has the right to prosecute only his own claim. To expand that right, to acquire the right to present claims of others, he must do more than simply allege disparate treatment generally. *See Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1312 (4th Cir. 1978).

*Remaining Motions—Holden v. Industries*

Because the Court finds no basis to certify a class on the claims of race or sex discrimination, the outstanding motions and objections of the parties may be decided as they were in *Garrett v. Industries*. Thus the motion to intervene will be denied. Defendant's objections to discovery are sustained on the basis previously recited in *Garrett v. Industries*.

As previously discussed in *Garrett v. Industries*, the Court is dismissing plaintiff Ramona Holden from that case. Furthermore, the Court is granting defendant Industries' motion for summary judgment on the claims of Holden in *Holden v. Industries*. However, plaintiff Holden may move to add and substitute R. J. Reynolds Tobacco Company as the party-defendant. If the motion is allowed, plaintiff Holden may pursue her individual claims of race and sex discrimination, and her suit shall hereafter be denominated as *Ramona B. Holden v. R. J. Reynolds Tobacco Co., C–76–176(a)–WS*.

Finally, since plaintiff Singletary raised both sex and race discrimination in *Holden v. Industries*, and because her claim of race discrimination in *Garrett v. Industries* is not related to the other plaintiffs' claims, she shall be dismissed from *Garrett v. Industries* and shall proceed with all of her individual claims in the previously-entitled case of *Holden v. Industries*.[20] Plaintiff Singletary's action shall hereafter be denominated as *Marie Singletary v. R. J. Reynolds Indus-*

*tries, Inc.*, C–76–176(b)–WS. As to both plaintiffs Holden and Singletary, this ruling shall not be construed as depriving them of any extension of the limitation period to which they would have been entitled as former plaintiffs in *Garrett v. Industries*.

IT IS THEREFORE ORDERED that:

(1) The plaintiffs' motion for class certification in *Garrett v. Industies* be, and the same hereby is, denied.

(2) The plaintiffs' motion for class certification in *Holden v. Industries* be, and the same hereby is, denied.

(3) The plaintiffs' motion to add R. J. Reynolds Tobacco Company as a party-defendant in *Garrett v. Industries* be, and the same hereby is, denied, but plaintiff Holden may move to add and substitute R. J. Reynolds Tobacco Company as the party-defendant in *Holden v. Industries*, within 20 days from the date of this Order.

(4) The defendant's motion for summary judgment on the claims of Ramona Holden in *Garrett v. Industries* be, and the same hereby is, denied as being moot.

(5) The defendant's motion for summary judgment on the claims of Ramona Holden in *Holden v. Industries* be, and the same hereby is, granted.

(6) The motions of Clara Pinkney and Robert Burt to intervene in *Garrett v. Industries* and *Holden v. Industries* be, and the same hereby are, denied.

(7) The defendant's objections to discovery in *Garrett v. Industries* and *Holden v. Industries*, as raised in the appeals from the Magistrate's orders, be and the same hereby are, sustained.

(8) Plaintiffs Holden and Singletary are hereby dismissed as plaintiffs from *Garrett v. Industries* and shall separately pursue their individual actions as follows: if Holden is successful in adding R. J. Reynolds

---

**20.** In addition, it is appropriate to permit Singletary to proceed solely in (previously-entitled) *Holden v. Industries*, because this action also encompasses violations of Title VII and sex discrimination which are not involved in *Garrett v. Industries* by virtue of this Court's ruling.

**52**

Tobacco Company as mentioned in (3) above, Holden's individual action shall hereafter be denominated as *Ramona B. Holden v. R. J. Reynolds Tobacco Co.*, C–76–176(a)–WS; Singletary's individual action shall hereafter be denominated as *Marie Singletary v. R. J. Reynolds Industries, Inc.*, C–76–176(b)–WS.

A ruling on consolidation of these cases will be reserved until the Final Pre-Trial Conference.

A judgment will not be entered until plaintiff Holden's time for moving to add R. J. Reynolds Tobacco Company has expired.